Mr. Burns. Good morning, Your Honors. And may it please the Court, I'm Thomas Burns and, along with Laureen Galeota Jaffe, we represent Ms. Williams. The discretion to perform Daubert's gatekeeping function is not discretion to perform the function inadequately. The District Court abused its discretion in two main ways. The first is that it confused its role as gatekeeper with the jury's role as fact finder because it continually substituted its judgment for that of the jury by conflating the merits of Dr. Mink's opinions with their discretion was it applied the wrong legal standards and it misunderstood or mischaracterized the facts. For example, when it confused the Category 1, Category 2 distinction, when it misinterpreted the McLean case, and when it misunderstood what Dr. Mink did and actually did in the underlying science. Can I ask you about the reliability prong here? This is where my concern is. And I'm not sure I understand Dr. Mink's, well, let me put it this way. I've read Dr. Mink's report. When you read his report, he has certain conclusions. There are not citations to those specific conclusions that might be important. Instead, there's just a list of references at the end. And when you go through his deposition testimony, he talks about, for example, on the dosing information, oh, I got this from the IRIS. The IRIS preamble explains how these numbers that EPA comes up with are doses that can be used. And even just setting aside our precedent in this circuit that talks about how you can't really use that. First of all, is the IRIS preamble in the record? I couldn't find it. Second of all, I looked online to get IRIS to see if I could understand what he was talking about. And I just don't see where that explanation is. And so there seems to me to be a disconnect between the numbers that he's using and explaining why those are, how those can be used as dosing standards. Right. So, factual question. Yeah. Yeah. So, yeah, he did do that analysis. I don't know if the preamble is in the record, but it's something that exists. It's something that you could take judicial notice of because it's a regulatory record. If it's not in the record, he says he went to it. And the way this works is they create, they look at all these studies and then they pick a number based on what they think should be the appropriate number. And so the easiest one is to look at SO2. And here, basically all these scientists get together and they say, well, let's look at this whole body of research and pick the right number. And they pick a number based on the acute effect on the sensitive population. So it's not like a long-term thing. It's like if you breathe this for five minutes or ten minutes, you're going to have some kind of morbidity, which doesn't mean you're going to die. It just means you're going to be hurt. And the number they pick initially was 140. And then in 2010, they knock it down to 75. But there's a little bit of an apples and oranges comparison that our disagreement with Mosaic is. Mosaic says, well, some of these studies are saying the number is much higher. But those are different because after they look at all this research, they come to the conclusion that 75 is the right number to protect because that's the number at which a sensitive population will be hurt. And we're part of that sensitive population. So he does this analysis, and he says the threshold level for the sensitive population, which is what Ms. Williams is in, is 75. And so the question is not really whether that is correct. The question is, is this a reasonable methodology for toxicologists to employ? And obviously, our position is— And so then that seems to me to run into our precedent, the toxic—right. So maybe you can address that. That's exactly where I was going to transition. The McLean case is different on multiple levels. McLean doesn't involve a toxicologist. It involves a pharmacologist. That expert completely disclaimed any necessity to have a dose-response number. He just said, oh, I don't think I need to. It's just I need to say something is there. And he ultimately said, well, any amount of the ephedrine and caffeine is too much and will cause some kind of injury. And the court correctly said, well, that's not good on multiple grounds. And in terms of the regulatory guidance, that's an FDA draft guidance that the FDA actually pulled because they said, well, we don't think there's a causal relationship here. And part of that is the data set that it was created on. That has to do with the adverse event reports, which is the worst kind of data set you can have because it's self-selecting, and it's just not—doesn't meet scientific rigor. So— Except here's the problem. Wasn't there more general language in the case that said something to the effect of the reason that we don't rely on these standards is because they are geared to provide guidance and pick up the most sensitive populations where they might have problems. And so since it's a health precaution that we're prescribing for, basically, we're going to err on the side of caution. And so these thresholds are too low. Isn't that what we basically said in that opinion? I don't think so. I think what you said was you need to be careful when dealing with these kinds of regulations because they often are predictive rather than causal. And so your position is that as long as you're aware of those problems, a given set of standards, might be okay if they anticipate more than being just predictive. Yeah. And the predictive versus protective is key distinction. Obviously, Mosaic's position is these are just—sorry, it would be great if that was their position. Their position is these are protective, not predictive. And our position is, no, the science underlying them establishes that it is predictive for the sensitive subpopulation, which is what Ms. Williams is a part of. So this is a distinguishable case, but it's part of this appeal. You have to read this case very closely. And there's some key language in that that you should focus on. And specifically, the McLean court said the court is not rejecting public health rules from consideration at means about causation for this specific plaintiff, not simply about protecting the public at large from risk of harm based on risk-utility analysis of the drug. So it's like, what does this really mean? That's okay. I understand your point. Thank you. Let me turn you to another question I have, and that concerns ruling out other etymology, like other— Harms. Yeah. Causes. Yeah, exactly. What exactly did he do to rule out anything else? Because that seems like it might be an issue. Or is it your position he didn't really have to, since she is a G6DP or whatever it is? G6PD. We're not saying that he didn't have to. We think that's an appropriate part of the methodology that a toxicologist needs to do. We're saying that he actually did that, and he discusses that, I believe, either at the deposition or perhaps in the affidavit that was submitted with the reconsideration motion. But he talks about how he considered all these other causes. Differential ideology, that's the word. So he considered for the airway remodeling, you know, possibilities of trauma—I'm looking at the wrong thing. Well, he considered, you know, things like her smoking, alternative causes. Like, for example, that's why he looked at the Chakraborty report, because he was saying, well, these are alternative ways that these—for example, the HAPs, the hazardous air pollutants, could reach him. He says, well, I looked at those things, and then I ruled them out. When Mosaic bickers with that, they don't—I don't think they're saying that that was incorrect. What they're saying is, we don't think you did this correctly. And that's more of a merits argument to me. That's something like, well, you know, maybe you're right, but, you know, the judge is not supposed to determine that. The jury is. It's enough to get through the gate, and then it goes to the jury. That's your position. Exactly. And part of the Dawbert mythology is, like, you know, the role as gatekeeper, you're just supposed to close the gate constantly. No, a gatekeeper opens the gate and closes the gate. And here, if the science is science, then it should come in. And the merits of that opinion should be determined by the jury. Did you want to hear more about McClain, or do you kind of understand our position about that? I understand, but whatever you think, I haven't spoken with my colleagues at all about this. Right, of course. Another part about the general causation opinion that caused him—caused the judge to reject the opinion was that, you know, he didn't consider the background risk, but the thing that she keyed on was his inability to remember at the deposition the precise numbers. And McClain actually addresses that. It says you don't have to have precise numbers for these kinds of things. A little bit of ambiguity is to be expected. It says that in a footnote. And then with respect to specific causation, one of the things the judge focused on was that he didn't independently calculate the doses. But you've got to remember, like, we're dealing with people and with very dangerous substances, so it would actually be unethical and perhaps illegal to perform human testing on, you know, these sensitive subpopulations with, you know, SO2 or these other radioactive metals. And instead what he did was he relied on these standards, which is, you know, it's based on human testing, but not—some of it's where they exposed people to it, but they were healthy people, and then other bits of it is animal studies. But all of this is considered by the EPA when they formulate these regulatory standards, and then they set it at a predictive causal level at the low end. And then he performs a weight of the evidence analysis, which is called Bradford Hill, and that's all of these different things that to scientists mean that you can draw a causal inference. And the judge says, well, you didn't do that because you didn't quantify the probabilities here. And again, that's the thing that McLean says. You don't really have to do that. You just got to weigh it and tell us what you think the answer is. And to the extent that there's a disagreement about whether that's the correct opinion, that's a question for the jury. Very briefly about the property damage issue, it begins and ends with the Dietz and Neff cases. There was a little bit of a sidetrack that we had with the Florida law. That doesn't need to be considered. It's just Dietz and Neff, and Dietz and Neff say that Ms. Williams could testify about her property's value. And then there's also a little bit of a distinct—we have a difference of opinion about the Benefield case and whether the damage was total or permanent. Our position is both total and permanent because it's caused by, in part, these phosphogypsum waste stacks that will always be there. They'll never be removed because these things just can't move. And so she's going to be continually bombarded by this dust, and the dust eliminates her ability to enjoy the property. So it's both permanent and total. That's our case. You've faced a rebuttal. Thank you. Mr. Weinstein. Good morning, judges. I'm David Weinstein. I'm with Greenberg-Trarick. My colleague, Ryan Hopper, to my right, we represent Mosaic in this case. Let me start by asking you, what else did they have to do in order to get Mink through the gate? Well, first and foremost, as a threshold matter, they had to embrace a genuine dose-response methodology, and they clearly failed to do that. And how would they have done that, or how could they have done that? They could have looked at the constituents of concern that they identified, looked to medical literature, and identified levels at which Dr. Mink, excuse me, could have opined were health-based. It is absolutely clear, and you asked about IRIS and NACs, and I can help with that. They're in the Federal Registry. They're cited in our briefs to the Westlaw sites for them, and they are clearly protective and not predictive. Every day, Your Honor, when I get in the elevator— NACs. Yes, and IRIS says so, and NACs says so. In other words, these are protective standards. It's no different than when I get in the elevator every day to go upstairs— But they're all prophylactics. Yes. And they're prophylactics. That's exactly right, Judge. They're built around a danger. Right. And if you get above the prophylactic, there's a potential. A potential. Yeah, but it may not be actionable enough. So, if I may— Actionable as at work. Right. To complete the analogy, if I get in the elevator every day, which I do at work, and it says maximum capacity, 12 people, no one exercising good common sense thinks that if the 13th person squeezed into that elevator, it was going to go crashing to the ground. And why is that? That's because that standard is a safety standard. It's protective. And what EPA did here was establish a 75 parts per billion standard, which is a one-hour standard, and it's measured by looking at the worst of the worst. So, if you look at that 75, it was exceeded for less than 1% of the time over a three-year period at a monitor-located hours—I'm sorry, miles—from the plaintiff's property. More importantly, however, if you look at NAAQS, they never modeled 75. There's nothing in NAAQS that speaks to a 75 parts per billion safety factor. What happened is they modeled at 400, and they modeled at 200, and they were human studies. And what they found is at 400, there was some statistically significant effects, and at 200, they found effects only in 5 to 30% of the population. EPA found that to be statistically insignificant. So, the— Except for the 5 to 30% of the population who had the problems. But those are studies where someone is wearing a mask, they're taking SO2 directly, and they're exercising asthmatics under moderate to heavy exercise. They're pushed, and then they look for an effect. Then the EPA administrator is left with a policy decision. And she looked at 150 as a limit. She looked at 100 as a limit. She looked at 50 as a limit. And she picked—she split the baby between 50 and 100, picked 75, and decided that would be protective of sensitive populations, importantly, Your Honors, with a margin of safety. And that's in the statute. You know, that's in the Clean Air Act itself, that the administrator must set a standard with a margin of safety. So, for Ms. Williams or Dr. Mink to maintain that 75 is a benchmark, a threshold at which health effects will be felt, would necessarily mean that the administrator of EPA violated the Clean Air Act by setting a standard that has no safety margin. And that did not happen. And IRIS, if you will, is worse. IRIS—and I'll read you just briefly. IRIS says, and this is EPA, IRIS reference concentrations cannot be used to predict the actual incidence of human disease or the type of chemical exposures may have on humans—type of effects, pardon me, chemical exposures may have on humans. The reference doses are an estimate with uncertainty spanning perhaps an order of magnitude. And, by the way, the only IRIS report that they produced in opposition to our Dobrit motion was chromium, and chromium is based on two studies of rodents, no human studies at all. And this Court has warned, I think, in McLean, that animal studies are insufficient to support causation. So the first error that Dr. Mink made was to seize onto completely protective and not predictive health standards. Take those standards and say, ah, if they're exceeded, ergo, it must be causation. And under McLean, that's improper. And under good principles of science, it's improper. Second, he never excluded background risk. It's a Dixit. He said that he did, but you've read his report, Judge Rosenbaum, and it's not there. And, importantly, in the record here are three prescriptions, if you will, that restrict Dr. Mink to his report, not a supplemental affidavit that's filed after a Dobrit motion has been granted and not even his deposition. One, Rule 26 restricts it. Two, Judge Scriven's case management order restricted it. And three, when we got this report, we knew it was inadequate, and we filed a motion, it's in the record, and said the report's insufficient on its face. We went to a hearing before Magistrate Judge Wilson, and Judge Wilson said if they don't want to amend the report, that's fine, but Dr. Mink is going to be restricted in his testimony to the four corners of that report. So nothing outside that report should bear on this Court's decision. With respect to the background risk, this Court's been very clear about background risk in McLean and otherwise. And it explained, if you read Dr. Mink's explanation of background risk, it makes it patently clear he doesn't understand what it is. Because when he's asked in his deposition, he says, what's the prevalence of pulmonary hypertension in the population? He says, I don't recall, it's large. What's the prevalence of obstructive pulmonary disease? The two conditions Ms. Williams complains of. I don't recall specifically, but it's significant. Now, in their briefs, they take the position that's sufficient to satisfy McLean. It has nothing to do with background risk as this Court has explained it to the district courts and practitioners. Background risk is the risk that a population that's exposed will show effects of a disease or a condition above background. In other words, above a population that's not exposed. So even if he had given numbers here, which he didn't, and said the incidence of pulmonary disease is 13%, that's only the first stage of a background risk analysis. Then you then have to say, okay, in Progress Village where Ms. Williams lives, what's the incidence of pulmonary disease and is it above that 13% background? It's the delta that is the elimination of background risk. And if you read his report, it's not that. I'm not sure that he had to or that she had to do that, because how would she get that information? How would she be able to determine what the incidence of pulmonary disease is in Progress Village? I mean, we can't set an impossible standard. No, and that's fair. But they could have looked at other similar populations. They could have gone to data from the Florida Department of Health. They could have gone to data from the U.S. Department of Health. And at least he could have said, in the population as a whole, this is the baseline. This is the baseline. And when asked, interestingly enough, we don't have to get too precise, and that's for the following reason. When asked, are you aware of any complaints, not 13.3, any complaints from any other Progress Village residents similar to Ms. Williams, Dr. Mink answered, not that I'm aware of, not one. But, again, I mean, public health or health information is protected under HIPAA. And, you know, I mean, I understand your point. I think, obviously, there is a background requirement. We've talked about it. It's clear that there is one. But I think we have to be careful about setting the standard so high that it's really not attainable. I think that's a fair point, Judge. But I think in a discussion of a Ph.D. toxicologist's report, there ought to be at least a discussion of what is the background incidence in a population, whatever data might be available, state of Florida, Hillsborough County, United States, what efforts were made to see if you could get the delta. And if he had made a genuine scientific effort and concluded that that data simply wasn't available, then Judge Scriven below could have looked at that as a factor of reliability and decided that it met the standard. But he didn't try. There's nothing. You also asked about the differential etymology. Which I think I misspoke and said etymology. But, yes, the etymology. And so in Chapman, this Court spoke quite a bit about it and said a reliable differential analysis, we called it several different things, requires an expert to compile a comprehensive list of hypotheses that might explain a plaintiff's condition. What could have caused the pulmonary problems? The expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures, and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation. Importantly, right from Chapman, an expert's failure to enumerate a comprehensive list of alternative causes and to eliminate those potential causes determines the admissibility of proposed specific causation testimony. There is no discussion of anything like that in the report. It's just not there. And in Gwyn versus AstraZeneca, an 11th Circuit case in 2010, this Court said an expert conducting a differential etymology must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause of the injury. An expert cannot simply dismiss alternative causes by stating the risk is essentially zero, which is what Dr. Mink did. That's your decision in Kilpatrick. Now here, if you look at the record, Ms. Williams had asthma since she was a child. She testified that both of her parents smoked heavily in a very small house. She testified that they smoked in the car. For years she lived at home. She testified that she has allergies that are so severe, and they make a point of it in their brief that when we took her deposition, they asked us, please don't wear aftershave or anything else. Her medical records indicate that she's morbidly obese, more than 100 pounds overweight. So with all due respect to Ms. Williams, there are lots of things that could have caused her to have some difficulty breathing. And so differential etymology would have required a good scientist to go through each of those and explain, as this court has prescribed in Chapman and in Gwinn and in Kilpatrick, and why precisely he had eliminated each of those causes. He did none of that. He did none of that. So in brief, the dose response, failure to do an appropriate dose response and blind reliance on regulatory standards in and of itself would cause, would militate for affirmance here. The court's well aware of the standard. It's abuse of discretion. It's particularly deferential in a Doebert context, and the court should be affirmed. The burden, of course, on getting evidence. Well, in part, some of it based on sufficiency, which goes into the discretionary. Right. The sufficiency of the proof. Right. I'm sorry. I'm talking about the sufficiency of the incidence of the exposure and all those kinds of things. Right. Let me briefly. Or not a discretionary call. In the time I have left to address the 701 issue. In order to testify to her lay opinion that her house was unsellable, here's the causal chain. She wants to testify there are toxins in and around my home. Two, they came directly from mosaic. Three, they have long-term health effects. Four, they permanently damaged my home. Five, under Florida law, I'd be legally required to disclose them. Six, if I did so in the future, no one would buy my home. And therefore, number seven, my home is worthless. So the first four, toxins, fate and transport of those toxins from mosaic, the permanent damage to her home and her legal requirement to disclose are all legal issues that require particularized expertise. They're governed by Rule 702, and therefore, they're precluded. They're barred under Rule 701C. And the cases they cite, by the way, are virtually all decided before the amendment to Rule 702 to add C. Next, she says, not that I've tried to sell it unsuccessfully. She admits I've never tried to sell it. So what the court found appropriately is that it was pure speculation whether someone, some hypothetical buyer might or might not be willing to pay for her home in the future and what that hypothetical buyer might be willing to pay. It's a pure hypothetical. If I decided to sell my home, no one would buy it. Hypotheticals, of course, Your Honors, are the realm of experts. They're not the realm of lay witnesses. And last, and very briefly, in an amended Rule 26 disclosure, she said, I have an appraisal on my home for $90,000. The property appraiser has appraised it for $50,000, and there's sales in my neighborhood, including on my own block. So not only does she want to testify to what we've already discussed, she wants to testify that her own appraiser is wrong, the Hillsborough County property appraiser is wrong, and that the market has ignored somehow the effects of the plant on value. And if you're going to testify that a market hasn't adequately discounted for the presence of a huge industrial facility that's been there for decades, I would submit that it would require an economist or a real estate appraiser. So that's a 701C preclusion as well. Thank you for your time. That concludes my argument. Ms. Burns. Do you want to address Mr. Weinstein's arguments on McLean? Yes. The McLean case is different because it's dealing with a different regulatory situation. The FDA is, like, only trying to establish protective levels, and the EPA in this case is also trying to establish protective levels, but those have to do with the general population and at acute exposures. And here we're talking about a sensitive member of the population, and for the sensitive member of the population, the EPA's regulations are predictive, not protective. That's the difference. Where can I find that? In the studies that Dr. Mase cited. Where? Because that's the problem, right? Okay. I mean, he mentions his conclusions, and then there's just a laundry list of things that he cited, and I can't tell where anything is. So if you have a citation, I'll be happy to take a look at it. I don't have a citation now, but I could file, like, a one-page thing saying these are what we think. Give me leave to do that in five days. Okay. And send a copy. Okay, before I file it, or just file it and serve him. Yeah. Yeah, of course. But that's the difference. So the apples and oranges that we have going on here is acute versus long-term and sensitive versus healthy member of the population. So, for example, to use the elevator analogy, it's set for 12 people, but what if those 12 people were, you know, a member of the all-Dallas Cowboys offensive line or sumo wrestlers? Would the 13th person cause the elevator to fall? Possibly if they're all, like, 350 pounds. And that's the situation that we've got here, and that's what Dr. Mink was talking about. The discretion, the standard of review is discretionary, but it's important to point out the district court didn't have an evidentiary hearing, didn't have a Daubert hearing, and those are normally very helpful in determining all of these very complicated Daubert issues. And had she done that, a lot of these scientific questions would have been answered. And this is something that you had pointed out in a footnote, Judge Choflat, in your opinion in the city of Tuscaloosa. They're helpful, and we should have had that here. And then when we're doing discretionary review, Judge Choflat also in your concurrence in the United States against Fraser, he said, well, let's do this more analytically. Let's split up the legal standards and the factual questions. So I think that's a helpful thing to do here. What were these factual findings clearly erroneous, and was the application of the legal standards legally incorrect, and that would be reviewed de novo. So I think that's the framework within which you ought to look at the problem. And then just as a final point on the property damage question, my colleague ticked off a lot of things that my client would have to testify about, but one of them is incorrect. It doesn't have to do with causation of human injury. She just has to prove under the specific statutory scheme that there was a discharge. So she doesn't have to have this like expert testimony about what these things actually do. She just has to say, look, this is scary stuff, and it would decrease the value of my property. So we're asking you to vacate the judgment and remand for further proceedings. Thank you. Thank you. Thank you, gentlemen. The court will be in recess until 9 o'clock in the morning. All rise.